Good morning. Mitch Tilner for the J.C. Penney Parties. Thank you very much for taking the case out of order. I appreciate that. I'd like to use ten of my minutes for my opening arguments on Penney's appeal, and I'd like to reserve ten minutes for rebuttal and to answer Beneficial's appeal. On Penney's appeal, the District Court recognized Beneficial's obligation to reimburse and indemnify Penney for any expense or liability it incurred handling claims under the B, F, and C policies. But the Court further ruled that Beneficial would be discharged from that reimbursement obligation if Penney handled the claim unreasonably. Now, this ruling was error because the Party's contract, all the contemporaneous documents, and the Party's course of dealing after the contract all show that the Party's intended to shield Penney from any expense, any liability, any payments under then-existing B, F, and C policies. Penney negotiated to buy B, F, and C so it could obtain licenses to sell health and accident insurance, not casualty insurance. Penney agreed to enter the transaction only if it would have no ultimate exposure or expense under those casualty policies. Let's look at the evidence. The Transit Reinsurance Agreement, which preceded the Final Purchase Agreement. That Transit Reinsurance Agreement stated that transit shall be responsible for investigation, defense, and adjustment of all claims arising from the reinsurance agreement. I gather that some of the pre-sale policies continued on. Is that correct? The policies continued in existence, and the claims were renewed. I gather some of them must have been renewed. I don't believe the record shows that, Your Honor. I believe the record shows that as of the purchase date, B, F, and C ceased writing casualty insurance. That was the plan. But this happened so many years later that I'm puzzled, as is Judge Paez, as to whether some of these policies were renewed or continued on. Well, that's an interesting question. It really is for a different case, though. That would be for the coverage case. The claim made under these policies is that back in the 1960s, the insureds committed acts that polluted the ground, and only recently do we know. Well, that really wasn't one. I guess what I was getting at, did Penny continue to receive any benefit from those policies in any way? No. None whatsoever? None whatsoever. The business was terminated. Penny did not want to have anything to do with it. Penny had no claims-handling employees. Penny did not want to be in the casualty business. That is precisely why the parties agreed that transit would handle everything having to do with any claims that came in under these older presale policies. Transit was to take over. Penny was to do nothing. Penny wanted out. It wanted to sell health and accident insurance. It did not want to be in the casualty business. Did it tender the defense here to Beneficial? It tendered the defense to transit, which is what transit agreed to do. The problem is transit became insolvent. Yes. That is what led to the whole problem. Transit became insolvent. The district court ruled that in that case, Penny had the obligation to defend, to cover, to handle claims in the first instance. However, under the purchase agreement, Penny, which never expected to have to handle any claims at all and never wanted to be in the business. But wasn't it contemplated that they might have to if the reinsurer failed? Yes. The agreement did contemplate this contingent liability, which the agreement called it a contingent liability in the event transit fails, yes, BF&C, and later Penny, would have to step up and take care of the claim. However, the agreement specifically said in the event of that contingent liability, Beneficial will reimburse Penny for any expense or liability it incurs. But the real problem, which you might as well address, is they didn't say they'd reimburse them for an imaginary claim. And so you have the question, was there an insurance policy or did they just carelessly think there was? Well, the agreement is pretty clear that Penny was to incur no liability. No, no. But if they just go out and say, you're insured, here's your money, nobody's guaranteeing that. And that, in effect, is what the Court has found, that Penny was so extraordinarily negligent that they paid out a nonexistent policy. Now, if you can convince us that there's something different, why? Well, Your Honor, Beneficial could have avoided the problem that it created by entering this contract and promising reimbursement. Well, Penny could have avoided the problem by asking, let's see the policy. Your Honor, let me point out, the contract did not promise just indemnity. I believe your question goes to the negligence of an indemnity and the California cases that address whether an indemnity. I suppose that's true. Okay. The agreement promised both indemnity and reimbursement. The parties deliberately used both terms in the same paragraph. What do you think? Any two big companies would agree that however stupidly or carelessly one of them pays out money, they can get it back from the other? Your Honor, I think the record is pretty clear. Penny never would have entered this deal if it thought that it, the quality of its claims handling, would determine whether it would be reimbursed. The reason Penny never would have entered this deal. You mean Penny could have paid a hundred fictitious claims and turned around and said, you pay us, we have no responsibility to sort them out? Your Honor, Beneficial was not at Penny's mercy, as you're suggesting. Beneficial, with the reimbursement duty, if it felt Penny was unable to handle claims or Penny was incurring unnecessary expenses or Penny was paying claims unnecessarily, all Beneficial had to do was take over the claim in the first place. But suppose if Penny paid out five of these imaginary claims and then turned around and said, please give us the money? Then Beneficial under the contract would be obliged to reimburse Penny. If Beneficial was dissatisfied, it could have said, Penny, stop handling claims, give them to us. In fact, Penny asked Beneficial to handle these claims and avoid this problem, and Beneficial did. Well, can you explain at all why Penny didn't, and Penny's lawyers didn't do better in looking at the Court of Oakland's claim? Your Honor, companies make mistakes. I can't deny that. There was a mistake made. That's not the issue. The parties' agreement anticipates, contemplates the possibility that Penny will incur some contingent liability, that Penny may have to handle a claim. Inherent in that is the possibility of a mistake, and the parties agreed that Beneficial would both indemnify and reimburse Penny for any expense. Counsel, I asked you if Penny had tendered the claims to Beneficial. You've just now stated that they, in fact, did. They tendered them to Transit as required by the Transit Reinsurance Agreement. They also tendered them to Beneficial after Transit was insolvent. They weren't required to do that. That was they did tender it to Beneficial. They did ask Beneficial to come in and take over. Beneficial refused. And instead, under the district court's ruling, what we have is a situation where instead of taking over the claim and minimizing any expense for stalling these problems, Beneficial now has an incentive to sit back, let Penny handle the claim, then take hot shots at how Penny handled the claim in order to get out of its reimbursement obligation. So what we're going to see, if this ruling is upheld, is an unending stream of Federal court actions in which Beneficial says, Penny dropped the ball. We don't have to reimburse. That's the problem with the district court's ruling. It gives Beneficial an incentive to step up and reimburse. Are you implying or saying that Penny's dropped the ball a number of times? I am not, Your Honor, but I'm saying Beneficial has alleged. And, in fact, promises to continue alleging on remand in this case. Beneficial says if this case is remanded, it will challenge Penny's claims handling after Penny admitted the existence of Policy 1281. So we know that litigation will be forthcoming. And in every case, it's in Beneficial's interest now to challenge Penny's claims handling in order to get around its reimbursement obligation. That is just a recipe for unnecessary expense and litigation. Schedule D of the purchase agreement, and in particular, Note 4, specifically says any liability Penny incurs under these presale BF&C policies will be indemnified by Beneficial. No exceptions. Now, Beneficial, well, I see my time, my first opening is up. I'd like to reserve the rest of my time for rebuttal. Thank you. Thank you. Good morning, Your Honors. Lou Anne Sachs on behalf of Beneficial Standard Life Insurance Company. As an opening matter, I need to correct the factual record. In fact, the tenders that Your Honors asked about were initially made to Beneficial Standard. It was made to Beneficial Standard in the context of Penny's assertion that Beneficial Standard had an obligation under Article V of the purchase agreement to step into the shoes of Beneficial Fire and Casualty, the actual issuing insurer, and to perform all of the duties of that insurer, not to reimburse. What's the difference between Beneficial Standard and Beneficial whatever? Beneficial Fire and Casualty is the actual subsidiary that was previously owned by Beneficial Standard, and the stock of which was sold in its entirety to Penny in 1967. So what we have occurring here is the transmission of an operating, existing insurance company and all of its liabilities from one parent, in that instance Beneficial Standard, to Penny. So Beneficial Fire and Casualty continued to have contractual obligations to policyholders on policies that it had issued before the sale was closed, after it was acquired by Penny. Now Beneficial Standard indemnified. Is that correct? Beneficial Standard had a paragraph that described generally and specifically the indemnity duties that it would have to Penny regarding the stock of Beneficial Fire and Casualty, as well as its affiliate corporation, Vermont Accident Insurance Company. And I'm going to address in just a moment, if I may, the specific proportions of that indemnity. Let me just ask. There was never any tender to Beneficial Standard? No, Your Honor. That is incorrect. The first person that Penny tendered to when it received claims under the BF&C policies was to Beneficial Standard, not to Transit. And in fact, as the findings of facts and conclusions of law, which are in the evidentiary record at approximately page 598 show, Penny tendered to Transit only when the district court issued its first summary judgment ruling saying that it was Transit that was obligated in the first instance. But Transit was in bankruptcy? Transit is in receivership, but Transit is still honoring claims. And in fact, these have been categorized as Class IV claims, but may be recategorized as Class III claims, in which case there would, in fact, be money available in the Transit receivership to pay the very claims from which Penny is attempting to seek reimbursement from Beneficial Standard. So it's just very important to remember that Penny's initial construction of the relevant indemnification provision here was not what it is telling this Court. It was that Beneficial Fire and Casualty, and it, Penny, is successor to Beneficial Standard, had no obligations whatsoever with regard to Beneficial Fire and Casualty's policyholders after the sale. It was completely removed from the transaction. It had no contingent liabilities, nothing. That was all in the auspices of Beneficial Standard. Beneficial Standard had to handle the policies, had to pay the claims, and had to seek any reinsurance that it should want to seek. It was only when the district court, in its initial summary judgment ruling, disagreed with Penny's construction of the contract and found that, indeed, Beneficial Standard, I'm sorry, Beneficial Fire still had the duties as the primary insurer to its policyholders that Penny switch to its current construction, which is that it has a right to reimbursement. What was the purpose of the reinsurance, then? Well, the purpose of the reinsurance is, it is, it would be in any instance, Your Honor. I'm a primary insurer. Well, in this transaction, in this scheme, in this sale. With regard to the Beneficial Fire and Casualty policies that were reinsured 100 percent by Transit, the notion was that Transit would be the one who would take over the handling for Penny. But it cannot step into the shoes for BFMC, the issuer, Beneficial Fire, unless there's an ovation agreement. So if Transit fails or Transit just ignores a demand by Beneficial Fire under that insurance agreement, Beneficial Fire continues to have all of the liabilities and all of the duties an insurer has to its policyholders. But Standard had indemnified against any costs that Penny incurred if they'd handled them correctly. Is that correct? Your Honor, I would read Article V differently. And I would say that the first obligation that Beneficial Standard has under that to the block of business that was reinsured by Transit is the very last sentence of Article V. It is the specific boundaries of Beneficial Standard's obligations on these policies. It says so long as Beneficial Fire and Casualty continues to have contingent liability on the policies that were reinsured by Transit, Beneficial Standard promises that it will cause Transit to maintain these multiple additional layers of reinsurance. Those additional layers of reinsurance are described in Schedule VI to Schedule D. So Beneficial Standard made a very specific and unique promise with regard to this block of business. We'll make sure that reinsurance is there. And, Your Honor, no time at the beginning of the paragraph. Well, you have to start with the qualifying clause, which says on the terms. So you just read those out? No, Your Honor, I don't. What I say is you go first to the specific. And only if Beneficial Standard has failed to perform the specific obligation regarding the Transit. Well, this sounds pretty specific. Beneficial Standard will pay.  Will pay, perform, and discharge. It goes on. And indemnify. And indemnify. Yes, Your Honor. Against and save them harmless from, and it goes on. You know, there's a whole series of little paragraphs. It does start off saying on the terms. Why isn't that? That seems pretty specific to me. But, Your Honor, the very last sentence applies just specifically to this block of business. So we start with the presumption that the first thing that Beneficial Standard has to do is to make sure that those reinsurance arrangements are maintained by Transit. Now, at no time has Penny asserted in this litigation that Beneficial failed that contractual obligation. There's no evidence whatsoever that those reinsurance arrangements aren't in place. And, in fact, there's evidence to the contrary. So since Beneficial ---- I didn't understand that to be the argument here. Your Honor, this has been set forth in the briefs, that Beneficial had solely that obligation under Article V. Now, if under Article V Beneficial failed to maintain those reinsurance arrangements, then arguably Penny has recourse, whether you want to call it consequential damages for breach of that promise to keep those insurance contracts in place, or whether you want to call it that we revert to the general indemnity language, the first place we have to look is to see if Beneficial did specifically what it promised to do, which was to cause Transit to maintain those reinsurance arrangements. No matter how you construe this contract, whether you adopt Penny's construction, whether you adopt Beneficial Standard's construction, or whether you adopt the trial court's construction, you still come to the conclusion that the last person you would come to in this list would be Beneficial Standard. That's the purpose for having all of these reinsurance arrangements. And we know that because the only parties who could take advantage of those reinsurance contracts were Penny and BF&C. Beneficial Standard is not a party to any of the reinsurance contracts. We also know that custodial accounts were created as even further backup to those reinsurance arrangements. Beneficial Standard put $5 million of its securities up to backup the reinsurance arrangements. Transit put $9 million of its securities up to backup the arrangements. Those custodial trust agreements say specifically that if in fact Transit doesn't honor its obligation, Penny is supposed to go to those custodial trust accounts. Beneficial Standard doesn't have the right or the ability to go to the custodial trust accounts. Only Penny and the entity that had acquired Beneficial Fire and Casualty have those obligations. Now, that is the reason that the district court did indeed find that as a condition precedent to coming to Beneficial Standard for indemnity reimbursement, Penny first had to exhaust all of its rights to reinsurance. It had to then seek only those recoveries, only net recoveries from Beneficial Standard. And it had to have handled the underlying insurance claims. Did Penny ever make a claim with the bankruptcy court? With the Transit reinsurance? Yes. Yes, Your Honor. But not until years after this litigation began and not until after the district court issued the order saying that it had to first go to Transit. So what happened in the bankruptcy court case? It's still unsettled. Those matters are still being resolved. The receivership is still ongoing. And they're determining what, if anything, to pay on Class IV claims. And this is a Class IV claim? This is a Class IV claim, or whether it should be recategorized as a Class III claim because of the nature of the reinsurance issue. Should we then be at least reserving the right to come to Beneficial Standard after the Transit litigation is all over? That is the decision, in essence, that the trial court made, that once Penny has availed itself of all its other remedies, it still has the right to come back to Beneficial Standard. And I'd like to just address that because when we look at a contract like this and we look at competing claims to how it should be construed, we have to look at it as a whole and we have to look at the equities that will result by application of one construction or another. And so let's step back for a second and look what really happened here. For $350,000 net of cash that was transferred, Penny bought an existing operating insurance company, Beneficial Fire and Casualty. It got all its licenses to do business. It got all of its already approved forms. It got all of its rights to reinsurance. It basically had the day after the closing the ability to conduct business for $350,000. But they intended only to use this to acquire the licenses. Isn't that right? Well, that is Penny's after-the-fact argument. There is no evidence to establish that. And, in fact, there is a representation that is included within the purchase and sale agreement expressly by Beneficial Fire and Casualty regarding its authorization and its licenses to conduct business as a property and casualty insurer. This is contained back in the schedules. Now, if, in fact, Penny's argument that all it ever wanted was some accident and health policies, why then would there be representations about Beneficial Fire's right to issue property and casualty businesses? And it goes beyond just the licenses, Your Honor. Because a license to do business as an insurance company just means that you can sell insurance. It doesn't mean that there's any policy form that you can issue in any state, because that is an additional condition precedent to selling insurance. I have to have forms that every state regulator has approved. And that was an extremely valuable asset that Penny acquired as a consequence of buying, in total, Beneficial Fire and Casualty. Now, in a stock sale, unlike an asset sale, the liabilities of the company being sold travel with it, and they are undertaken by the acquirer of the stock, unless there is a very clear statement of an assumption of the liabilities by the selling company. This contract does not have an assumption agreement. You may say it has an indemnification provision, but it does not have an assumption agreement. And so, again, stepping back for a moment and looking at the circumstances of the transaction. On the day before Beneficial Standard sold Beneficial Fire and Casualty, Beneficial Standard had itself no liability and no exposure to risk for Beneficial Fire and Casualty's policies. If Beneficial Fire and Casualty couldn't pay policies or couldn't recover reinsurance to its policyholders, that liability could not be upstreamed to Beneficial Standard. So what Penny is asking the court to construe this contract to mean is that for the low, low price of $350,000, Beneficial Standard agreed to take on wholeheartedly, voluntarily, the assumption of $13 million in estimated policy liabilities. Now, typically, when you look at a stock sale and you see that the selling company has taken on, has assumed some of the liabilities of the company that's being sold, there is a statement of valuable consideration. There's a price. The lower the price for the stock sale, necessarily, the lower the amount of liabilities retained by the selling company. So why, we have to ask ourselves, would Beneficial Standard have undertaken what was estimated to be $13 million in contingent liabilities for $350,000? And even if it was going to do that, why would it not have made itself a party to any of the reinsurance contracts which were providing the protection for it? When we look at that and then we look at the result that has inured with the two claims that are the subject of Penny's appeal, the Port of Oakland claims under policy number 1281 and 1284, we see why Penny's construction of this contract as a whole just doesn't make any sense. Penny's saying we can be as cavalier as we want in our contractual obligations to our policyholders. We don't have to act reasonably. We don't have to act in an objective manner as an insurance company would. We don't have to go be reasonable in pursuing our reinsurance recoveries. Again, we could be negligent in doing that. We could do something that's below the objectively reasonable standard. Let me ask you this, which is off this subject. Was this negligence active or passive? Your Honor, ultimately, the trial court concluded it was active negligence, but then the court went further and found it was even more. The court found that it was actually unreasonable as a matter of law, that no reasonable insurance company. That's a reasonableness is different from active and inactive. I'm asking whether this was active or passive. The court found it was active negligence, Your Honor. Now, what they did was to fail to assert a defense for a lost policy. Is that right? They did that, Your Honor, and they also did more. In addition to failing to assert the defense, they actually took another insurance policy without any evidence that there was any similarity between the insurance relationships and created a policy from whole cloth. They said this is now the policy that is in effect for all time to come between the Port of Oakland and beneficial fire and casualty. So it's not only that there is a defense that has been waived, there has actually been a policy created. And that policy not only binds beneficial fire and casualty. That's kind of semantic. What they did was to say that these are the terms that were in the lost policy. That is correct, Your Honor, except there was no secondary evidence whatsoever of the terms of the lost policy. There was some very, very minor evidence of the existence of the lost policy, but there was no evidence of the terms. Who has the obligation to maintain a copy of the policy? The insurer who issued the policy, as well as the insured. And in this instance, neither BF&C, as the issuing insurer, nor the Port, as the insured, had a copy of the policy. And one of the things that happened was the secondary evidence that there was a, just out of curiosity. That there was a policy? Yes. There was one letter, drafted in 1967, that attached to it what appeared to be a draft invoice that identified the policy number and said how much the premium would be for that. And that's both with regard to 1281, the primary policy, and 1284, the excess policy. There was so little secondary evidence of this policy that it was disputed if even the alleged primary policy was, in fact, a primary policy. There was no canceled check. There was no policy register. There was no evidence offered by anyone who had personal knowledge of the policies. There was literally nothing but the one letter and the attachment to it. And the Court found that that was not only inadequate to establish the existence of the policy, because it never showed that it took effect or that it was ever canceled, but that there was absolutely no evidence of the material terms and conditions. There was no evidence that beneficial fire and casualty had used standardized forms or, in fact, what kind of form policy had been used here, if any. And, in fact, there was some evidence that it might have been a negotiated manuscript policy. But by admitting the existence of policy 1281 and creating these terms for it, it also waived the defense that was available to the excess policy, 1284, obviously if it's an excess policy. It cannot ever be triggered if the underlying policy is not shown to exist. So they concede the terms of the excess policy? They did not concede the terms of the excess policy. So they can still argue about whether the excess policy exists, but it's all rather moot, since obviously an insurer can never submit a claim under the excess policy only. So all claims that Penny will submit will necessarily be tendered under the primary policy, 1281, as well as the excess policy. Did the Port of Oakland have a copy of this letter? Is that how they knew that there might be insurance? No. Actually, the copy of this letter came out of another entity's files, Zurich, which was another insurer of the Port of Oakland. The Port had no evidence in its possession whatsoever. And so when we look for it at the issues that are the subject of Penny's appeal and this notion that the Court somehow erred in discharging Penny, notwithstanding what Penny admits was objectively unreasonable conduct, we find ourselves saying how can anyone in an indemnity contract ever be assured that its indemnity will perform consistent with not only the terms of the written indemnity contract, but the terms of Civil Code Section 2778, which is written into every indemnity contract. And here, Penny violated multiple provisions of 2778. It didn't act with the discretion that is referenced in 2778-3. It did not act with good faith. And as a consequence, it also waived the defense under policy 1284. Thank you. Thank you. First, let me respond to the argument and to Judge Noonan's concern that Penny can simply pay out claims willy-nilly and then turn to Beneficial and, say, reimburse us. The contract had an implied covenant of good faith and fair dealing. It did not act with good faith. As all contracts do. Penny, of course, has an obligation to act in good faith. The trial court never concluded that Penny did not act in good faith. The trial court concluded Penny acted unreasonably. So the notion that Penny is unbounded and can do whatever it wants at Beneficial's expense is not correct. Now, with respect to the argument that Penny purchased an ongoing business, the purchase agreement itself said this. It assured Penny that on the closing date, BF&C would not be a party to any contract or have any obligations, liabilities, or business, with certain exceptions shown on Schedule D, namely the contingent liabilities that are at issue in this case. The agreement said BF&C shall have no business. The memorandum of understanding that preceded the agreement said the same thing. BF&C will not have any liability or business. The parties intended that Penny be able to wash its hands of the casualty business to the extent possible, recognizing the contingency that transit the reinsurer might fail, and specifically recognize that if transit did fail and Penny had to step up, then Beneficial would not just indemnify but also reimburse. The active-passive issue that Judge Fletcher mentioned does not even bear on the reimbursement provision. There's no law that qualifies a reimbursement promise based on the quality of the indemnity's conduct. Counsel's argument about Article V, as Judge Paez noted, reads essentially everything out of the article except the last sentence. But the article is very clear. Beneficial will indemnify. Beneficial will reimburse. And lest there be any doubt, Note 4 in Schedule D says if there are contingent liabilities that Penny realizes, Beneficial will indemnify Penny as provided in Article V. It's contended that you failed in your responsibility to tender to transit. In the early 70s, when claims started coming in on some of these policies, Penny wrote to Beneficial and said, Here comes a claim under a BF&C policy. Please take care of it. Beneficial would forward it on to transit. Beneficial never questioned its obligation, never questioned the fact that Penny had nothing to do with these claims, had no obligation to defend them, no obligation to incur any expulsion. Were all those claims – were you able to determine if all those claims that were sent initially to Beneficial all ended up at transit? I believe the record shows that the ones – the ones in the record, I believe, did end up at transit. Yes, transit was around until 1985, I believe. So I believe all those ended up at transit. I believe Beneficial simply forwarded them on pursuant to its – transit's agreement to take care of all these claims. And there was a claim made in the bankruptcy court? Yes. Still pending. I believe that's correct. Yes. Counsel said the purchase price was $350,000. I don't – I'm not sure that's correct. I didn't see that in the record and I don't see it in the briefs. So maybe Penny just got a better deal, huh? That's the way it turns out, apparently. Beneficial would like to get out of the deal because it turns out that transit failed, Penny had to incur some expenses, Penny had to incur some liability. Nobody – certainly the parties did not think that would happen. They contemplated the possibility. I assume they expected transit to continue on to everyone's benefit. But that didn't happen. Transit failed. These fell to Penny. And now Beneficial wants to escape its obligation to reimburse and indemnify Penny for all expenses. Transit cannot handle claims now. That's why Penny is doing so. As far as the alleged shifting interpretation of the agreement by Penny, we have consistently interpreted this agreement to require unqualified reimbursement. There's never been a change in position on that. Counsel may be referring to the arguments on the duty to defend, which was disputed in the district court. The parties disputed whether Beneficial or Penny had to step in and defend in light of transit's failure. Okay. That was disputed. There's never been a dispute or never been a concession by Penny that Beneficial did not have a reimbursement obligation, nor has there been a concession by Penny that it unreasonably handled the claim. Counsel asserted Penny admitted unreasonable conduct. That is not correct. Penny has never admitted it. We did not challenge it on appeal, but we do not concede it. But you didn't challenge it on appeal. No, we did not, Your Honor. We did not challenge it on appeal because, in our view, it was supported by substantial evidence. The evidence was in conflict. We did not challenge that on appeal. But in our view, that really has no legal significance. Well, you know, all the concessions that were given were rendered by a law firm, Wilson. Was it Wilson, Ice? Wilson, Elsa, Your Honor. Wilson, Elsa? I mean, were they coverage counsel or were they? I believe they were. And they were doing the best they could with a policy that was 30 years old. They were trying to do the best they could for the insured Port of Oakland and, in fact, resolved the doubts in favor of the insured, which is, I would say, a commendable act by an insurance company. I think it's an obligation, else you're going to be sued for bad faith. You're supposed to put yourself in the position of the insured. That's exactly right, Your Honor. And that is why Penny is between a rock and a hard place. Penny is supposed to accommodate and take care of the interests of the BFC insureds under these old policies. Yet Penny, according to Beneficial, is supposed to attend to Beneficial's interests and minimize any expense that Beneficial will have to later pay. Well, Penny has two masters. That's not a tenable position. The more reasonable view is that Beneficial cannot control or restrict Penny in the claims handling. Penny's obligation is to the insured. If Beneficial wants to minimize or limit or completely eliminate the possibility it will have to later pay Penny, Beneficial should simply take the claim in the first place. Since it's going to pay for the claim, Beneficial can take the claim in the first place and thereby eliminate any risk that Penny might make a decision more favorable to the insured than Beneficial would make. Now, let me just get to policy 1284 before I close. The district court held that Beneficial was discharged under not only 1281, which was not unreasonable, but also 1284. Penny never admitted the terms of 1284. The lost policy defense is still available should a claim come in under 1284. Penny was not unreasonable. Beneficial has not been prejudiced, yet the district court seemed to sweep 1284 into the ruling, principally because the same secondary evidence of 1281's existence was the secondary evidence of 1284's existence. But for a lost policy defense, you can admit the existence of a policy. As long as you as long as the insured cannot show the terms, your lost policy defense is solid. Well, that's the burden of the insured. Under the Dart case from the California Supreme Court, the insured must prove both existence and terms. Penny has never admitted the terms of 1284. And in fact, the Court's findings of fact so state. Penny never admitted the terms of 1284. So the judgment should be reversed with respect to the finding that 1284 has been admitted and the finding that Beneficial is discharged under 1284. That finds no legal or factual support in the record. Thank you very much. Thank you very much. Thank you for your arguments. We appreciate it. The matter will be submitted.
judges: B. Fletcher, Noonan, Paez